UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
NATASHA SANDYFORD,                           :
                                             :
                    Plaintiff,               :         **MEMORANDUM AND ORDER**
                                             :         06 CV 6785 (DLI) (JMA)
          -against-                          :
                                             :
FORT GREENE SENIOR CITIZEN'S                 :
COUNCIL, INC.,                               :
                                             :
                    Defendant.               :
------------------------------------------------------X

**DORA L. IRIZARRY, United States District Judge**:

      Plaintiff, a former employee of Defendant Fort Greene Senior Citizen's Council, Inc. ("Fort

Greene"), filed the instant action alleging discrimination on the basis of sex and retaliation in

violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e *et seq.* ("Title

VII"), New York State Human Rights Law, Executive Law § 290 *et seq.* ("NYSHRL"), and New

York City Human Rights Law, New York City Administrative Code § 8-101 *et seq.* ("NYCHRL").

Fort Greene filed the instant motion, seeking summary judgment on all claims pursuant to Rule 56

of the Federal Rules of Civil Procedure.  For the reasons set forth more fully below, Fort Greene's

motion is granted in its entirety.

**BACKGROUND**

**I.**    **Plaintiff's Employment History**

      The following facts are undisputed or, when disputed, it is either so indicated or they are

taken in a light most favorable to non-moving Plaintiff.  Plaintiff graduated high school in August

1

2004. (Boop Decl., Ex. A.)[1] Plaintiff neither worked nor attended school during the period between high school and her employment with Fort Greene, which commenced in late June 2005. (Sandyford Dep. 18:12-22:14.) Plaintiff learned about an available clerical position at Fort Greene through her mother, Carolyn Nixon ("Nixon"). Nixon knew Merlyn Bruce ("Bruce"), the director of Fort Greene's Christopher Blenman Center ("Center"), who suggested that Plaintiff apply for the position. (Sandyford Dep. 27:6-18.) Bruce interviewed Plaintiff on June 20, 2005, and immediately hired her on a part-time basis, informing her of her duties and her rate of compensation, which was seven dollars an hour. (Sandyford Dep. 28:2-31:19.) After her employment with Fort Greene ended in September 2005, Plaintiff unsuccessfully sought employment with two employers. (Sandyford Dep. 58:6-62:2.) She then began attending school at Kingsborough Community College in February 2007.[2] (Sandyford Dep. 61:4-62:6.) She was unemployed from September 2005 until that time.

## II. Employment Status at Fort Greene

The parties dispute whether Fort Greene hired Plaintiff on a temporary or permanent basis. Fort Greene contends that it hired Plaintiff as a temporary employee, a substitute for Leishanna Lawrence ("Lawrence"), while Lawrence worked temporarily at another center. In support of this contention, Fort Greene submitted numerous documents indicating Plaintiff's temporary status. On the second page of Plaintiff's employment application, in a section completed by Bruce, Bruce described Plaintiff as the "Sub for Ms. Lawrence during summer months" and Plaintiff's term of

---

[1] Arlene F. Boop, counsel to Fort Greene, submitted a declaration with attached exhibits in support of Fort Greene's motion. The court will herein refer to that document as the "Boop Decl."

[2] The record suggests that Plaintiff may have worked "off the books" for her father's beauty salon. (Sandyford Dep. 52:4-22.)

employment as running from "06/20/05-09/30/05." (Boop Decl., Ex. C.) The Center's payroll form for the first week of Plaintiff's employment described her as a "Sub Clerical Aide" and indicated that she was "summer help in Ms. Lawrence's absent [sic]." (Boop Decl., Ex. B.) On internal payroll forms, Plaintiff's name is accompanied by an asterisk as are the names of all temporary employees, to indicate her temporary status. (Boop Decl., Ex. J.) Additionally, as indicated on internal payroll forms, Plaintiff was not assigned an employee number. (*Id.*) Employee numbers are only assigned to permanent employees. (*Id.*) Notably, Plaintiff signed her time records each week, which indicated that she was "Summer Help" or a "Sub Clerical Aid." (*Id.*)

Fort Greene also submitted affidavits indicating Plaintiff's temporary status. Three residents of the Center—Gladys Francis, Enid Simmons, and Oscar Roberts—indicated that Plaintiff was introduced to them as Lawrence's temporary replacement. (*See generally* Francis Aff.; Simmons Aff.; Roberts Aff.; *see also* Bruce Aff. ¶ 13.) Lawrence indicated that her transfer to another center was temporary, and that she left personal belongings at her desk (the same desk Plaintiff used), while she worked at the other center. Lawrence observed that those items remained unmoved when she visited the Center at various times during the summer and upon her return in September 2005. (*See generally* Lawrence Aff.) Plaintiff testified that she never saw Lawrence's personal belongings while working at the Center. (Sandyford Dep. 36.)

Plaintiff contends that Fort Greene hired her as a permanent employee. Plaintiff testified that she first learned that she was temporary "summer help" in late September 2005, after complaining to Bruce about Gordon Bayne, another employee at the Center. (Sandyford Dep. 101-02; *see also* Boop Decl., Ex. U.) Fort Greene disputes this assertion. Bruce stated that on September 5, 2005, she "reminded" Plaintiff that her last day of work at the Center would be September 30, 2005, and

informed her that the residents intended to throw her a farewell party.  (Bruce Aff. ¶ 17.)  Nixon, Plaintiff's mother, testified that Bruce told her that Plaintiff had a permanent position.  (Nixon Dep. 9, 15.)  Bruce denied telling Nixon that the position was permanent.  (Bruce Aff. ¶ 10.)

The parties also dispute whether Bruce indicated in the interview that she intended to hire Plaintiff as a permanent employee. Fort Greene contends that Bruce made no such statements to Plaintiff.  According to Fort Greene, under its internal policies, Bruce needed confirmation from Claudette Macey ("Macey"), Fort Greene's Executive Director, to hire permanent employees.  (Macey Dep. 15:21-17:18.)  Bruce never sought confirmation from Macey and introduced Plaintiff to residents as Lawrence's temporary substitute.  (Bruce Aff. ¶¶ 12, 13.)  Macey understood that Plaintiff was hired as a temporary employee as Bruce hired her without seeking confirmation.  (Macey Dep. 21:4-10, 29:8-12.)  Plaintiff contends that Bruce intended to hire her as a permanent employee.  Plaintiff testified that Bruce told her that Bruce would need to speak with Macey about the interview.  (Sandyford Dep. 30:22-31:31.)  Plaintiff did not state that Bruce told her she would be a permanent employee; rather, Plaintiff apparently inferred from this statement that she was a permanent employee.  Regardless of the inference that Plaintiff suggests, the evidence demonstrates that Plaintiff was hired immediately and began working at the conclusion of her interview with Bruce.  (Sandyford Dep. 29:12-17, 31:6-10.)

## III.    Gordon Bayne

It is the alleged unlawful conduct of Gordon Bayne ("Bayne"), another employee at the Center, that is the subject of this suit.  The Center employed Bayne as its full-time Program Assistant.  (Bayne Dep. 10:22-11:19.)  Bayne was sixty-nine at the time the alleged conduct occurred.  (Bayne Dep. 7:14-15.)  He was married, with two adult children and four grand children.

(Bayne Dep. 8:2-10.) This complaint is the first and only complaint ever filed against Bayne during his lengthy career. (Bayne Dep. 49:5-12; Macey Dep. 49:23-50:2.)

The parties dispute whether Bayne supervised Plaintiff. Fort Greene contends that Bruce, not Bayne, supervised Plaintiff. Several witnesses, most notably, Plaintiff's mother, stated that they understood that Plaintiff reported to Bruce, not Bayne. (Bruce Aff. ¶ 15; Bayne Dep. 22:15-20, 55:18-22; Nixon Dep. 12:6-8.) Plaintiff testified that Bruce, alone, extended her hours on occasion. (Sandyford Dep. 107:18-22.) Bruce interviewed and hired Plaintiff and set her compensation.

Plaintiff contends that both Bruce and Bayne supervised her. Plaintiff testified that in her interview with Bruce, Bruce told Plaintiff that she would assist both Bruce and Bayne with clerical work. (Sandyford Dep. 30:2-7). Bayne provided training to Plaintiff on certain clerical duties. (Bayne Dep. 21:24-22:5, 24:4-18; Nixon Dep. 11:23-12:5.) Plaintiff testified that she reported to Bayne and that he "was usually in charge of most of the work that [she] had to do." (Sandyford Dep. 114:7-14; *see also* Sandyford Dep. 115:5-10.) It is undisputed that Bayne occasionally assigned tasks to Plaintiff, such as photocopying records. (Bayne Dep. 22:21-24:13; Bruce Aff. ¶ 16.)

## IV. Alleged Unlawful Conduct

Some of the alleged unlawful conduct is undisputed. It is undisputed that, for a period of time, Bayne greeted Plaintiff in the morning with a hand shake and then, after time, greeted her by kissing her hand. (Sandyford Dep. 78:25-79:6.) Plaintiff never asked Bayne to stop or told him that it made her uncomfortable. (Sandyford Dep. 79:4-9; Bayne Dep. 25:15-26:3.) Bayne called Plaintiff at her home on two occasions. Both calls occurred during the three-day period between Plaintiff's complaint to Bruce on Thursday, September 15, 2005, and Macey's return to work and initiation of an investigation on Monday, September 19, 2005. The first call occurred on Friday, September 16,

2005. (Bayne Dep. 36:16.) Bruce instructed Plaintiff to remain at home to insure her separation

from Bayne prior to Macey's return. Plaintiff received full compensation for that day. Bayne called

Plaintiff to find out where she kept a payroll disc. (Sandyford Dep. 95:8-19; Bayne 36:23-37:2.)

Plaintiff testified that she did not think that this call constituted harassment. (Sandyford Dep.

109:20-110:3.) Bayne called Plaintiff a second time, on Sunday, September 18, 2005. (Bayne Dep.

36:19-20.) According to Plaintiff, he called "to ask how [she] was doing." (Sandyford Dep. 77:23-

24, 96:14-16.) She believed that this call constituted harassment because "he didn't really have any

reason to call." (Sandyford Dep. 110:12-13.) Bayne testified that he had placed an order for perfume

for his wife with Plaintiff, who sold cosmetics through a catalog, and called Plaintiff to inquire about

the status of his order.[3] (Bayne Dep. 37:8-38:11.) Bayne did not learn of Plaintiff's complaint

against him until Monday, September 19, 2005, when he met with Macey. (Bayne Dep. 42:3-23.)

The parties dispute the remainder of Plaintiff's allegations. Plaintiff testified that she noticed

Bayne observing her arrivals and departures at the Center each day through a window in the

lunchroom. (Sandyford Dep. 79:24-80:7.) Bayne stated that he routinely observed residents while

they were outdoors to insure their safety, which was part of his duties. (Bayne Dep. 28:15-29:6.)

Plaintiff testified that: (i) once, when her boyfriend visited her for lunch, Bayne inquired about her

visitor, (ii) once Bayne put his arms around her when she was in his office, (iii) once he asked her

for a kiss, and (iv) once he leaned his face near her face. (Sandyford Dep. 82:3-8, 85:14-19; 88:14-

---

[3]    It is uncertain whether Bayne called Plaintiff for this purpose; however, it is
undisputed that Plaintiff sought his business. He produced a copy of a prior purchase order at his
deposition. (Bayne Dep. 38:12-17.) Further, according to Bayne, Plaintiff solicited and
appreciated his business as it helped her obtain new customers. (Bayne Dep. 37:8-21.)
Additionally, when her initial sales attempts were unsuccessful, he lent her a book on
salesmanship. (Bayne Dep. 37-38.)

89:6, 89:12-93:9.)  Bayne denied each of these allegations.  (Bayne Dep. 29:23-31:7, 43:2-7).

## V.    Fort Greene's Policies

Fort Greene had a sexual harassment policy ("Policy"), which was posted in various locations at the Center, including in the offices of Bayne and Bruce.  (Bayne Dep. 15:16-17:14.)  Bayne stated that he was aware of the Policy.  (Bayne Dep. 15:16-16:21.)  The Policy defined "sexual harassment" and indicated that individuals who violate the Policy or who knowingly allow others to violate it will face sanctions.   Victims of sexual harassment are directed to "file a complaint with Grace Harewood" ("Harewood").  (Boop Decl., Ex. M..)  Fort Greene last updated the Policy in 1998, and since then, Harewood ceased working at the Center.  (Macey Dep. 33:12-15.)

The parties dispute whether Plaintiff knew of the Policy.  Fort Greene contends that Plaintiff was on notice of the Policy as it was posted in various locations around the Center.  (Def. 56.1 ¶ 62; Boop Decl., Ex. M; Bayne Dep. 15:16-17:14.)  Further, a copy of Fort Greene's anti-discrimination policy was attached to the employment application Plaintiff completed.   (Boop. Decl., Ex. C.) Plaintiff denies that she received any employment related policies with her employment paperwork. (Sandyford Dep. 32:11-14; 42:23-44:6.)  Plaintiff contends that she first received a copy of the Policy after complaining to Bruce, and that Fort Greene cannot confirm that she received a copy prior to this time.  (Pl. 56.1 ¶ 15.)

## VI.    Fort Greene's Investigation

On Thursday, September 15, 2005, Nixon called Bruce to inform her that Plaintiff did not want to report to work as Bruce would be on vacation that day and Plaintiff did not want to work alone at the Center with Bayne, who had harassed her.  (Bruce Aff. ¶ 20; Nixon Dep. 13:10-15:25; Sandyford Dep. 66:13-68:13.)  Bruce forfeited her day off and escorted Plaintiff from her home to

the Center. (Bruce Aff. ¶¶ 21-22.) Once at the Center, Bruce interviewed Plaintiff. Plaintiff stated

that she was required to obtain the keys to her office from Bayne each morning. She added that he

regularly kissed her hand and observed her arrivals and departures at the Center. (Bruce Aff. ¶ 23.)

To avoid any further contact with Bayne, Bruce instructed Plaintiff to work from Bruce's office.[4]

(Bruce Aff. ¶ 24; Sandyford Dep. 71:19-21.) Later that day, Bruce contacted Macey, to inform her

of the complaint. (Macey Dep. 31:14-19.) Macey, who was out of town, instructed Bruce to

separate Plaintiff and Bayne and to request that Plaintiff report to the Center on the following

Monday for an interview with Macey. (Macey Dep. 31:23-32:15, 34:10-24; Sandyford Dep. 73:3-

74:21.) Following this conversation, Bruce instructed Plaintiff to remain at home the following day,

Friday, September 16, 2005, for which she was fully compensated. (Sandyford Dep. 74:13-24.)

On Monday, September 19, 2005, Macey and Bruce interviewed Plaintiff. (Macey Dep.

36:13-16.) The level of detail regarding the alleged harassment that Plaintiff provided them is

unclear.[5] Macey and Bruce then interviewed Bayne. (Macey Dep. 36:13-16.) Bayne admitted to

kissing Plaintiff's hand, contending that such conduct is customary in Barbardos, his country of

birth.[6] (Macey Dep. 37:9-15.) Macey and Bruce then conducted a meeting with both Plaintiff and

---

[4]    Unbeknownst to Bruce, and in violation of this instruction, Plaintiff returned to
her own desk at some point during that day, which was located directly across the hall from
Bayne's office. (Bruce Aff. ¶ 25; Sandyford Dep. 72:2-10.)

[5]    Macey asserted that Plaintiff told them only that Bayne kissed her hand. (Macey
Dep. 36:21-37:5.) Plaintiff testified that she informed them of several additional allegations.
(Sandyford Dep. 76:19-77:14.)

[6]    Plaintiff disputes that this conduct is customary as Bayne did not kiss the hand of
other female employees. (Pl. Opp. at 13.) Bayne stated that he greets other "young ladies,"
though it appears that they were not Center employees. (Bayne Dep. 26:8-27:6, 53:25-54:14.)

Bayne, during which, Plaintiff informed them that Bayne watched her arrival and departure from the Center each day. (Macey Dep. 37:23-38:13.) At the conclusion of the meeting, Macey informed them that Fort Greene takes allegations of sexual harassment seriously and that Fort Greene would promptly conduct an investigation. (Macey Dep. 38:17-23.)

After these meetings, Macey insured that Bayne and Plaintiff would remain separated for the duration of Plaintiff's tenure by assigning Bayne to report to a different facility effective September 20, 2005. (Macey Dep. 38:24-39:14.) Macey immediately issued a memorandum to Bayne, memorializing Fort Greene's intent to investigate Plaintiff's allegations. (Boop Aff., Ex. N.) In another memorandum, dated September 20, 2005, Macey directed Bayne to refrain from "making any kind of physical contact with anyone on the job." (Boop Aff., Ex. O.) The memorandum also instructed Bayne that Fort Greene "employs people from several cultural backgrounds" and that Bayne "should not assume that everyone shares the same culture." (*Id*.) Finally, the memorandum warned him that he would face "disciplinary action[]" for any further violations. (*Id.*) Macey immediately requested that Daniel L. Alterman ("Alterman"), outside counsel for Fort Greene, conduct an investigation of Plaintiff's allegations. (Macey Dep. 40:12-41:22.)

Plaintiff did not encounter Bayne at the Center after this meeting; however, Plaintiff testified that she was fearful of encountering him again as no one told her that he was transferred. (Sandyford Dep. 114:15-21; 115:11-18.) Plaintiff admitted that Macey informed Plaintiff that Bayne's conduct was inappropriate, that he would receive a warning, and that Fort Greene takes such complaints seriously. (Sandyford Dep. 115:19-116:20.) Plaintiff resigned on September 29, 2005, informing Bruce that she would not report to work on her scheduled final day, September 30, 2005. (Bruce

Aff. ¶¶ 29-30.)  Bruce encouraged Plaintiff to finish her term, as the residents of the Center intended to throw her a farewell party.  Plaintiff declined.  (*Id*.)  Bruce mailed Plaintiff a farewell card from the residents in appreciation for her work.  (Bruce Aff. ¶ 29; Boop Decl., Ex. R.)

## VII.    Outside Counsel's Investigation

Alterman immediately initiated an investigation into Plaintiff's allegations.  (Boop Decl., Ex. X at 3.)  On September 21, 2005, Alterman interviewed Bayne, who admitted to kissing Plaintiff's hand.  (*Id*.)  Alterman experienced difficulty obtaining information from Plaintiff.  Macey first requested that Plaintiff submit a written complaint on September 19, 2005.  (Macey Dep. 39:22-40:11.)  Macey testified that she requested the written complaint to assist Fort Greene with its investigation as Plaintiff was "foggy" about the details.  (*Id*. at 42-43.)  Plaintiff allegedly promised to provide a written statement, but failed to do so.  (Boop Decl., Ex. X at 3.)  On September 22, 2005, Macey wrote to Plaintiff requesting that Plaintiff put her complaint in writing, attaching a copy of the Policy to assist her.  (Boop Decl., Ex. P.)  After Plaintiff failed to respond to this request, Macey sent another letter, dated October 4, 2005.  (Boop Decl., Ex. S.)  Plaintiff submitted a written complaint to Fort Greene on or after October 24, 2005.  (Boop Decl., Ex. U.)  Upon receipt and review of this document, Alterman requested that Plaintiff meet with him to discuss the complaint and to provide a list of potential witnesses.  (Boop Decl., Ex. V.)  He interviewed Bayne a second time regarding Plaintiff's additional allegations.  (Boop Decl., Ex. X at 4.)  Bayne admitted calling Plaintiff's home; however, Bayne indicated that at the time he made these two calls, he was unaware of Plaintiff's complaint.  (*Id*.)  Bayne denied observing her or initiating or requesting any other physical contact.  (*Id*.)  In a letter dated November 11, 2005, Plaintiff's attorney indicated that Plaintiff wished to participate in the investigation.  (Boop Decl., Ex. W.)  Based on the record, there

was no further contact between Fort Greene or Alterman and Plaintiff's attorney.

Upon completing the investigation, Alterman drafted a report, dated November 18, 2005 ("Report"). (Boop Decl., Ex. X.) It indicated that Fort Greene's response to Plaintiff's complaint was "prompt, effective and responsive." (*Id*. at 2.) It found that Bayne's kissing of Plaintiff's hand "may have been perceived . . . as sexual harassment [in] violation of the policy"; however, Bayne did not intend to harass Plaintiff or know that he "was violating any policy because Ms. Sandyford did not express any discomfort . . . and that was his customary way of greeting all females."[7] (*Id*. at 4.) The Report noted that during the investigation, Alterman was unable to determine if Sandyford warned Bayne that kissing her hand made her uncomfortable. (*Id*. at 5.) Atlerman determined that the hand kissing was "neutral on its face" and found "no violation of the policy." (*Id*.) The Report found the additional allegations "uncorroborated" and "unproven." (*Id*.) The Report recommended that Fort Greene (i) issue Bayne a letter condemning his conduct and informing him that any further physical contact perceived as harassing may result in dismissal, (ii) place a permanent letter in Bayne's file, (iii) counsel Bayne to avoid contact with female employees, (iv) observe Bayne's conduct for two years, and (v) remove the reprimand, after the passage of a reasonable amount of time with no further incidents.

## DISCUSSION

### I.      Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[7]      Bayne indicated that he had greeted only one other female at Fort Greene in this manner and that she was not an employee or a resident. (Bayne Dep. 53:25-54:14.)

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Res. Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). However, summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases." *Abdu Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). To defeat a motion for summary judgment, however, the nonmoving party "must provide more than conclusory allegations of discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). There is no genuine issue of material fact for trial unless sufficient evidence in the record

exists favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. (internal citations omitted).

## II. Application

The court construes the complaint and moving papers as alleging discrimination on the basis of sex in the form of (i) adverse employment action, (ii) sexual harassment, (iii) and retaliation in violation of Title VII. The court construes the sexual harassment claim as encompassing hostile work environment and constructive discharge.

### A. Discrimination

Under Title VII, it is "an unlawful employment practice for an . . . employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2007). To prevail against a motion for summary judgment, a plaintiff alleging discrimination on the basis of sex must establish a *prima facie* case, by demonstrating: (i) she is a member of a protected class, (ii) her job performance was satisfactory, (iii) she suffered an adverse employment action, and (iv) the action occurred under conditions giving rise to an inference of discrimination. *See, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006).

In the instant action, Plaintiff cannot establish a *prima facie* case, as she cannot establish that her termination occurred under conditions giving rise to an inference of discrimination. Records provided by Fort Greene indicate that, as of June 20, 2005, Fort Greene intended to terminate Plaintiff's employment on September 30, 2005. (Boop Aff., Ex. C.) Additional records indicated Plaintiff's temporary status. (Boop Decl., Ex. B.) Plaintiff's understanding of her employment

13

status with Fort Greene is irrelevant to the determination of whether Fort Greene possessed the requisite discriminatory animus; however, it merits noting that Plaintiff was on notice of her temporary status long before she claims. Each week Plaintiff signed time records that indicated that she was "summer help" or a "Sub Clerical Aide." (Boop Decl., Ex. J.) Plaintiff cannot escape this documented evidence of her notice of temporary status. No reasonable trier of fact would find that her termination occurred under conditions giving rise to an inference of discrimination. Accordingly, the court grants summary judgment in Fort Greene's favor on the adverse employment action claim.

### B.    Hostile Work Environment

#### 1.    Legal Standards

Title VII protects employees from "discriminatorily hostile" or "abusive" environments. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). A work environment is "discriminatorily hostile" when (1) "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *id.* (internal quotation marks and citations omitted), and (2) "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Avon*, 118 F. 3d 106, 110 (2d Cir. 1997).

Regarding the first element, the harassment must be "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse," and the victim must also subjectively perceive the environment as abusive. *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439, 436 (2d Cir. 1999) (citation omitted). Furthermore, the hostility must arise from the plaintiff's membership in a protected class. *Forts v. City of N.Y. Dep't of Corr.*, No. 00 Civ.1716 (LTS) (FM), 2003 WL 21279439, *4 (S.D.N.Y. June 4, 2003) ("An environment

that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes.") (citing *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).  A plaintiff must demonstrate a series of sufficiently continuous and concerted incidents that altered the conditions of his or her working environment; however, even a single incident may suffice if the incident was "extraordinarily severe."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation omitted).  The factors the court must consider include:

> (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.

*Richardson*, 180 F.3d at 437 (internal quotation marks and citations omitted).  The court must consider the factors cumulatively to achieve a realistic view of the workplace.  *Id.*; *Cruz*, 202 F.3d at 570.  The question is a "mixed question of law and fact," and summary judgment is only appropriate "where application of the law to those undisputed facts will reasonably support only one ultimate conclusion."  *Richardson*, 180 F.3d at 437.

Regarding the second element, the court must evaluate whether there is a basis for imputing liability to an employer for the harasser's conduct.  "[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer [may be] subject to vicarious liability."  *Mack v. Otis* Elevator Co., 326 F.3d 116, 123 (2d Cir. 2003) (internal quotation marks omitted).  To determine whether the alleged harasser is a supervisor, courts look to whether the alleged harasser had the ability to take tangible employment action against the complainant, such as the ability to hire, fire, promote, transfer, discipline or to cause a significant change in benefits.  *See id.* at 124.  Additionally, courts look to whether "the

authority given by the employer to the employee enabled or materially augmented the ability of the [harasser] to create a hostile work environment for his subordinates." *Id*. at 126. If the court determines that the harasser is the victim's supervisor, the employer is liable unless the employer establishes that "it exercised reasonable care to prevent and correct harassing behavior and that the employee did not avail herself of the corrective or preventative opportunities." *See Durant v. A.C.S. State and Local Sols. Inc.*, 460 F. Supp. 2d 492, 498 (S.D.N.Y. 2006). "[W]hen the hostile work environment is created by a coworker or a low-level supervisor who does not rely on his supervisory authority when carrying out the harassment, the employer is liable if it has 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir.1997).

### 2. Application

#### a. Alleged Unlawful Conduct

Even construing all of the facts in Plaintiff's favor, the court finds that Plaintiff has failed to raise a triable issue of fact, based on the five factors to be considered in evaluating a hostile workplace claim. *See Richardson*, 180 F.3d at 437. The kissing of Plaintiff's hand occurred fairly regularly during a few weeks of Plaintiff's tenure at the Center. Plaintiff did not ask Bayne to refrain from kissing her hand. Plaintiff did not report the conduct to anyone at the Center until several weeks after it began. Notably, Plaintiff testified that she failed to warn Bayne or to report the conduct to Fort Greene because she "didn't think anything of it." (Sandyford Dep. 79:9.) Bayne's alleged observation of Plaintiff's arrivals and departures also occurred regularly during Plaintiff's tenure at the Center. It is also alleged that on one occasion, he inquired about a male who visited her at the Center. Plaintiff did not ask Bayne to refrain from observing her and did not report this

conduct to Fort Greene until weeks after it had begun. Further, Bayne was required to observe the comings and goings of the Center to insure the safety of its residents while they were outdoors. Bayne called Plaintiff's home twice. Plaintiff admitted that Bayne had a legitimate, work-related reason for the first call. He needed to know where Plaintiff kept a payroll disc and he did not pursue the conversation any further than this inquiry. Plaintiff found the second call harassing because "he didn't really have any reason to call." (Sandyford Dep. 110:12-13.) The substance of the call, according to Plaintiff, was "to ask how she was doing." (Sandyford Dep. 77:23-24, 96:14-16.) Finally, Plaintiff alleges three instances in which Bayne initiated or requested additional physical contact, such as a kiss or a hug.

With the exception of the hand kissing and observing, the alleged unlawful conduct consists of a few sporadic incidents. Hand kissing and the request for or initiation of physical contact such as hugging at the work place is inappropriate; however, on the whole, the conduct does not rise to the level of severity that is actionable in this circuit. *See Durant v. A.C.S. State & Local Sols. Inc.*, 460 F. Supp. 2d 492, 497-98 (S.D.N.Y. 2006) (granting summary judgment in defendant's favor and holding that offensive jokes, a comment by a supervisor regarding her sex life, and two requests for sex did not rise to the level of a hostile work environment); *Godineaux v. LaGuardia Airport Marriott Hotel*, 460 F. Supp. 2d 413, 421-23 (E.D.N.Y. 2006) (granting summary judgment in defendant's favor and holding that repeated "hissing" at plaintiff, stray anatomy-related comments, stray sexually suggestive comments and gestures, one request for sex, and one attempt at a kiss did not rise to the level of a hostile work environment). There is nothing perverse, overtly sexual, or physically threatening about the conduct Bayne allegedly engaged in or his alleged communications with Plaintiff. Despite her conclusory statements, Plaintiff was not subject to humiliation and

ridicule. There is no evidence that any other employee or any residents knew of or witnesses the alleged unlawful conduct, until Plaintiff complained to Bruce, at which point Bruce immediately remedied the situation.

There is no evidence that Plaintiff suffered psychological harm. While harm is not required, it is relevant to "whether the plaintiff actually found the environment abusive. *See Harris*, 510 U.S. at 22-23. Finally, there is no evidence that the conduct interfered with Plaintiff's ability to work or that it was of such a level that she felt compelled to resign. To establish constructive discharge, a plaintiff must demonstrate that the employer "deliberately created working conditions that were so difficult or unpleasant that a reasonable person in employee's shoes would have felt compelled to resign." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (internal quotation marks omitted). Bayne was transferred to a different work site immediately following Plaintiff's complaint to Macey. Plaintiff did not encounter Bayne again and the alleged unlawful conduct ceased. Plaintiff resigned one day shy of the end of her term of employment with Fort Greene—a day that she knew would be spent with the residents in celebration of her service at the Center. Under these facts, no reasonable person in Plaintiff's shoes would have felt the need to resign. Accordingly, the court grants summary judgment in Fort Greene's favor on this claim.

### b. Employer Liability

The parties dispute whether Bayne supervised Plaintiff. There is no evidence that Bayne undertook any tangible employment action against Plaintiff; rather, it was Bruce who interviewed and hired Plaintiff, informed Plaintiff of the end of her term of employment, set her pay rate, and on at least one occasion, discussed performance issues. Nothing in the record indicates that Bayne was involved with or prompted these actions. Moreover, it is undisputed that Bayne did not have the

18

ability to undertake employment actions against Plaintiff. No reasonable trier of fact would find that Bayne took or prompted any adverse employment action against Plaintiff. As Plaintiff correctly notes, the test for whether an employee is a supervisor is broader than simply determining where the victim and alleged harasser fall on a corporate organizational chart. An employer can be held vicariously liable for the actions of an employee carried out under authority of the employer that "materially augmented" his ability to create a hostile work environment for another employee regardless of his or her title. Assuming *arguendo* that Bayne can be considered a low-level supervisor under this broader definition,[8] Fort Greene should not be held liable for Bayne's conduct.

Fort Greene took immediate and effective corrective action. Upon hearing of Plaintiff's allegations, Bruce forfeited her day off to immediately address Plaintiff's complaint. Plaintiff and Bayne were immediately separated. Bruce immediately called her supervisor, Macey, who was out of the office, but scheduled time to interview Plaintiff and Bayne on Monday, September 19, 2005, the next business day. Macey told Plaintiff and Bayne that Fort Greene takes sexual harassment

---

[8] On the whole, the evidence supports a finding that Bayne was not Plaintiff's supervisor. Bayne trained Plaintiff on how to perform certain administrative duties; however, this limited training is more akin to an orientation than a supervisor setting work expectations. Other than Bruce, Bayne was the only employee who could teach Plaintiff how to perform her duties and it appears that to some extent their duties overlapped. Bayne's minimal instruction does not make him a supervisor. Bayne occasionally asked Plaintiff to make photocopies. Again, it appears that their duties overlapped, thereby making Bayne's occasional requests more akin to teamwork than supervisory delegation. The same is true of the allegations that he reviewed certain reports that she prepared. Aside from Plaintiff's testimony, the only evidence in support of Plaintiff's contention is that Macey testified that Bayne supervised some of Plaintiff's work as Plaintiff was a temporary employee. (Macey Dep. 56.) It is clear that within the organizational structure of the Center, Plaintiff did not report to Bayne. She only reported to Bruce. Notably, Plaintiff's mother believed that Plaintiff reported to Bruce alone. Construing the evidence in favor of the non-moving Plaintiff, the court deems Bayne the equivalent of a low-level supervisor of Plaintiff.

allegations seriously, which bore out in the aftermath of Plaintiff's complaint. Macey immediately requested that outside counsel conduct an investigation and transferred Bayne to another facility. Plaintiff did not encounter Bayne for the remainder of her tenure at the Center. There is no evidence of any further harassing conduct. The two calls he made to her home, one of which she admitted was for a legitimate business purpose, do not negate Fort Greene's efforts. *See Durant*, 460 F. Supp. 2d at 497-99 (granting summary judgment in employer's favor even though the alleged harasser had contact with the victim after the victim initially complained to the employer and the employer had separated the parties). Bayne was reprimanded, counseled, and placed on probation.

Plaintiff did not report the alleged unlawful conduct until weeks after it began; however, it is undisputed that Fort Greene had a sexual harassment policy in place. Fort Greene is not required to demonstrate that Plaintiff received a copy of the Policy. "If there is a policy, and if the policy is invoked (as it was in this case) to redress the harassment (which occurred in ths case), the employee has no basis to complain." *Durant v. A.C.S. state and Local Sols. Inc.*, 460 F. Supp. 2d 492, 498 n.3 (S.D.N.Y. 2006). Thus, Plaintiff failed to raise a triable issue of fact regarding Fort Greene's liability and Plaintiff's hostile work environment claim must be dismissed for this reason as well.

## B. Retaliation

### 1. Legal Standards

Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e -3(a). To determine whether summary judgment is appropriate in a retaliation claim, courts apply the three-pronged burden shifting framework set forth in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a *prima facie* case of retaliation. *Id.* The defendant may then rebut by articulating a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* The defendant's burden at this stage is merely one of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993). However, once the defendant meets this burden, "[t]he presumption of [retaliation] . . . drops out of the picture." *Id.* at 510-11 (internal quotation marks and citation omitted). The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment decision was motivated by unlawful discrimination. *See Stern v. Trs. of Columbia Univ. in the City of N.Y.,* 131 F.3d 305, 312 (2d Cir. 1997).

The employee's burden of proof at the *prima facie* stage of a summary judgment motion is *de minimus.* *See Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001). However, the employee must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir. 1995). To make out a *prima facie* case of retaliation, the employee must demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action detrimental to the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See Hunter v. St. Francis Hosp.,* 281 F. Supp. 2d 534, 546-47 (E.D.N.Y. 2003) (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998)). The adverse employment action must be one that a reasonable employee would have found materially adverse; *i.e.*, "it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Sante Fe Ry. Co.*, 548 U.S. 53, 68 (2006). Causation may be

established, directly or indirectly, by showing, for example, that the retaliatory action occurred close in time to the protected activity. *Hunter*, 281 F. Supp. 2d at 547.

### 2. Application

Plaintiff engaged in protected activity when she complained to Bruce about Bayne's conduct. It was either Bruce or Macey who determined Plaintiff's last day of work, and both of them were aware of Plaintiff's complaint. It is questionable whether Plaintiff can establish causation; however, for purposes of the instant motion, the court will deem causation established by temporal proximity as Plaintiff's last day at the Center was shortly after she complained to Bruce. Fort Greene met its burden by asserting a legitimate, non-discriminatory reason for Plaintiff's termination—the natural expiration of her predetermined term of employment. As set forth above, Plaintiff cannot establish that this reason was mere pretext. No rational trier of fact could find that Fort Grene's asserted reason for Plaintiff's termination was pretext. The court grants Defendant's motion for summary judgment on the retaliation claim.

### C. Supplemental State and City Law Claims

As Plaintiff's federal claims do not survive the Defendant's motion for summary judgment, the court declines to exercise supplemental jurisdiction over the remaining state and city law claims. *See* 28 U.S.C. § 1367(c)(3).

**CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment is granted in its entirety and this action is dismissed.

SO ORDERED.

Dated:  Brooklyn, New York
     March 16, 2009

_____
/s/
Dora L. Irizarry
United States District Judge
